*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re BELL/BELL-SMITH, MINORS.

UNPUBLISHED
May 21, 2019

No. 345373
Oakland Circuit Court
Family Division
LC No. 2016-841534-NA

Before: SHAPIRO, P.J., and BORRELLO and BECKERING, JJ.

PER CURIAM.

The minor children, through their lawyer-guardian ad litem (L-GAL), appeal by leave granted the trial court's order denying petitioner, Department of Health and Human Service's (DHHS), request to terminate respondent-father's parental rights to the minor children. By this order, the trial court also ordered that DHHS continue with efforts to reunify respondent-father with his three children: JB, CBS, and TBS. At the outset, we note that the L-GAL only challenges the trial court's order with respect to respondent-father; the L-GAL does not take issue with that aspect of the court's order denying the termination of respondent-mother's parental rights and permitting her additional time to work toward reunification. The DHHS has not taken a position in this matter. Because we conclude that the trial court did not clearly err, we affirm.

In April 2016, respondents were staying in a motel with their children JB and CBS, and respondent-mother's two older daughters. At the time, respondent-mother was also pregnant with respondent-father's daughter, TBS. On April 21, 2016, the family was evicted from the motel. Finding themselves homeless, respondents approached Child Protective Services later that day and asked that the children be temporarily placed in foster care. DHHS took possession of the children and, on that same day, it filed a petition requesting that the court exercise jurisdiction over the children. Respondent-mother pleaded responsible to the allegations in the petition, and the court found statutory grounds to exercise jurisdiction over the children.

Respondent-father was not named as a respondent because, at the time of filing, he was merely deemed the putative father of JB and CBS. It would take several months before respondent-father was determined to be the legal father of JB, CBS, and TBS. In the interim, respondent-father voluntarily submitted to a psychiatric evaluation on December 30, 2016, with

-1-

psychiatrist Dr. Mark Silverman. At the end of the assessment, Dr. Silverman concluded that respondent-father's history supported a dual diagnosis of substance abuse and schizoaffective disorder. Dr. Silverman recommended a referral to Community Mental Health for long-term treatment, including prescriptions for antipsychotic medication.

After respondent-father's status as the children's legal father was confirmed, a supplemental petition was filed identifying him as the legal father and naming him a respondent in the petition. The petition specifically alleged that respondent-father had unaddressed psychiatric diagnoses that placed his children at risk of harm. In February 2017, respondent-father pleaded no-contest to the allegations in the petition and the court found statutory grounds to assume jurisdiction over the children. The case immediately proceeded to disposition at which point respondent-father was ordered to comply with a parent-agency treatment plan (PATP) that included participation in substance abuse therapy, drug screens, anger-management therapy, individual therapy, a psychological evaluation, a psychiatric assessment, parenting classes, and parenting time. Over the course of the six months that followed disposition and the implementation of the PATP, respondents' compliance with their treatment plans was deemed inconsistent. Consequently, in August 2017, a petition was filed seeking termination of respondents' parental rights.

At the conclusion of the termination hearing, the trial court denied the petition, instead ordering DHHS to continue reunification efforts. Although the court found that respondents had failed to comply with the requirements of their PATPs, it also concluded that DHHS had failed to make reasonable efforts to assist respondents in removing the barriers to reunification, stating:

> Here, the children have come into care because of homelessness. Both Respondent-Parents have mental and/or cognitive disabilities that inhibit them from progress. Neither Respondent-Father nor Respondent-Mother have been provided the appropriate resources, despite being aware of the Respondent-Parents' special needs. In addition, merely handing the Respondent-Parents a card regarding housing without helping them through the process is not a reasonable accommodation to either Respondent-Parent. DHHS knows Respondent-Parents suffer from known disabilities and have special needs regarding mental health and homelessness and, therefore, the Court does not find that clear and convincing evidence [sic], given the Respondent-Parents' special needs, to find one or more statutory basis for termination of parental rights exist to terminate the Respondent-Parents' parental rights.

> The Court ORDERS DHHS to provide appropriate accommodations to both Respondent-Parents. Both Respondent-Parents shall proceed with reunification and proceed under a Parenting Plan, with DHHS to provide a psychiatric evaluation for the Respondent-Parents with proper treatment and assistance with housing.

On appeal, the minor children, through their guardian ad litem, argue that the trial court erred when it found that DHHS failed to make reasonable efforts to work toward reunification. We disagree.

Before a court may contemplate termination of a parent's parental rights, the DHHS must make reasonable efforts to reunite the family. MCL 712A.19a(2). The purpose of the treatment plan is to facilitate the return of the children to their parents. *In re Mason*, 486 Mich 142, 156; 782 NW2d 747 (2010). DHHS's statutory duties to update a parent's treatment plan and provide the parent with necessary and relevant reunification services continue throughout the case. *Id.* "The adequacy of the [DHHS]'s efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009). This Court reviews the trial court's findings regarding reasonable efforts for clear error. *In re Smith*, 324 Mich App 28, 43; 919 NW2d 427 (2018). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Hudson,* 294 Mich App 261, 264; 817 NW2d 115 (2011).

In *In re Hicks/Brown*, 500 Mich 79; 893 NW2d 637 (2017), the Supreme Court considered whether the DHHS made reasonable efforts to reunify an intellectually disabled parent with her children. The Court considered obligations that arise under both the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and the Michigan Probate Code, MCL 712A.21 *et seq*. Under the Probate Code, "the Department has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *Id.* at 85. The Court also noted that the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* at 86 (quotation marks and citation omitted). The Court then held that the DHHS neglects its duty under the ADA to reasonably accommodate a disability when it fails to implement reasonable modifications to services or programs offered to a disabled parent. *Id*. Similarly, the Court stated that "efforts at reunification cannot be reasonable under the Probate Code if the Department has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Id*.

The L-GAL asserts that the trial court erred when it found that DHHS failed to provide respondent-father with appropriate resources because DHHS does not have a duty to accommodate parents with mental health issues, but only those parents with intellectual, cognitive, or developmental disabilities. In support of this position, the L-GAL relies on this Court's decision in *In re Hicks*, 315 Mich App 251; 890 NW2d 696 (2016). The L-GAL has ignored that this Court's decision in *In re Hicks* was affirmed in part and vacated in part by the Supreme Court in *In re Hicks/Brown*, 500 Mich 79. Regardless, neither this Court's decision nor that of the Supreme Court's stands for the proposition that the duty to accommodate a disabled parent only extends to intellectual, cognitive, or developmental disabilities. Such an interpretation would lead to absurd results. For example, following the L-GAL's reasoning, DHHS would not have a duty to accommodate a parent with sight, hearing, or mobility impairments.

Moreover, the L-GAL's reasoning is inconsistent with the language of the ADA, which defines disability to include mental health issues. Specifically, the ADA defines "disability" to mean "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 USC 12102(1). "Mental impairment" is defined to include "any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or *mental illness*, and specific learning disability." 28 CFR 35.108(b)(1) (emphasis

added). For purposes of the ADA, "major life activities, include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communication, and working." 42 USC 12102(2)(A).

While a review of the ADA provisions is instructive, it is not necessary for us to determine whether the duty to accommodate includes accommodating a parent with mental health issues. With respect to respondent-father, the existing record supports the conclusion that this case was less about accommodation and modification of policies and practices and more about simply making the referrals necessary for him to obtain psychiatric treatment, which most likely would have included the prescribing and monitoring of psychotropic medications.

From the outset, DHHS was well aware of respondent-father's untreated mental health issues. Indeed, in December 2016, even before adjudication, respondent-father voluntarily complied with DHHS's request that he submit to a psychiatric evaluation. As indicated earlier, Dr. Mark Silverman found that respondent-father's history and presentation was consistent with a dual diagnosis of substance abuse and schizoaffective disorder, bipolar type. Dr. Silverman recommended, among other things, that DHHS (1) refer respondent-father for a neurological examination related to a possible seizure disorder, and (2) refer respondent-father to Community Mental Health for long-term medical management and dual-diagnosis treatment. Dr. Silverman explained that the treatment would likely include the prescribing of antipsychotic medications and mood stabilizers.

Moreover, after respondent-father was found to be the children's legal father, the ensuing petition alleged that he had an unaddressed psychiatric diagnosis that placed his children at risk of harm. After he pleaded no-contest to the allegations of the supplemental petition, and the court assumed jurisdiction over the children based on his conduct, the court-ordered February 2017 PATP required that respondent-father participate in substance abuse therapy, drug screens, anger management therapy, individual therapy, a psychological evaluation, *a psychiatric assessment*, parenting classes, and parenting time. Clearly, the need for psychiatric treatment was recognized, and indeed, actually ordered.

We acknowledge that DHHS referred respondent-father to ACCESS for a psychiatric evaluation in July 2017, and an actual appointment was scheduled for August 2017. Apparently, at this ACCESS intake, respondent-father's psychiatric needs would have been assessed and referrals would have been made from there. This appointment, however, was nearly seven months after the PATP was entered. Moreover, caseworker F. Marcum was aware that respondent-father missed the appointment because of transportation issues. While DHHS provided respondent-father with bus passes, Marcum also admitted that on at least one occasion, there had been problems with respondent-father receiving the passes. Further, there is no indication that DHHS made any re-referrals or engaged in any follow up.

The testimony of the three caseworkers further validates that DHHS did not seriously consider and address respondent-father's psychiatric condition. Marcum said she reviewed Dr. Silverman's report but nonetheless testified that she was unaware of respondent-father's history of psychiatric treatment as a child. She was, however, aware of Dr. Silverman's recommendations for treatment. Further, Marcum testified that respondent-father's therapist had

advised her that respondent-father would benefit from a psychiatric evaluation so that he could get prescribed medication. Despite this knowledge, Marcum waited nearly six months to refer respondent-father to ACCESS for the psychiatric evaluation.

After Marcum left, T. Carson worked with this family from October 2017 until February 2018. During her four-month tenure, Carson did not review respondent-father's psychological evaluations. Additional testimony was inconsistent. First, Carson testified that she was not aware and nobody informed her of respondent-father's mental health issues. She was not aware that a neurological examination had been recommended or that long-term mental health treatment, particularly medication, was warranted and recommended. Later in her testimony, however, Carson admitted that in October 2017 and then again in February 2018, respondent-father's therapist advised her that he needed psychiatric services and medication. The third case manager, W. Jackson, took over responsibility for this family on February 16, 2018. Consequently, when she testified at the March 9, 2018 termination hearing, she had been working with the family for less than a month. Jackson admitted that she had yet to review any of respondent-father's psychological evaluations.

Respondent-father completed another psychiatric evaluation in May 2018. However, the record suggests that his participation in this psychiatric assessment was not accomplished through efforts made by DHHS, but rather, by the efforts of respondent-father's therapist who apparently became frustrated with DHHS's failure to refer respondent-father to a psychiatrist. Carson candidly admitted the delay in getting psychiatric intervention was a result of miscommunication. This conclusion is borne out by the record. Marcum testified that DHHS was responsible for the referral while Carson testified that she understood that because of Medicaid issues, respondent-father was required to do it on his own.

In addition to the foregoing, there is support for the finding that respondent-father would have benefited from a timely psychiatric referral. Respondent-father's therapist, Carly Cenit, was of the opinion that respondent-father's failure to progress was most likely related to his severe mental illness and the need for psychiatric medication management. Cenit reported a diagnosis of depression, anxiety, and post-traumatic stress disorder. Cenit also expressed her belief that having three different caseworkers impeded respondent-father's progress. Finally, Cenit opined that if respondent-father were given more time and put on the appropriate psychotropic medications, he could progress and be more compliant with the treatment plan.

Based on the existing record, the trial court did not clearly err when it found that DHHS did not make reasonable efforts to reunify respondent-father with his children. DHHS's efforts were insufficient to address the issues that brought the children into care: chronic homelessness and untreated mental health issues.

As an alternative argument, the L-GAL argues that even if additional efforts had been made, it was unlikely that respondent-father would have complied with these additional services or benefited therefrom. From this, the L-GAL apparently reasons that the court could therefore ignore the efforts expended by DHHS. Even if this argument had any merit, the record does not support the finding that respondent-father would have failed to participate in psychiatric services.

In many respects, respondent-father was in compliance with his treatment plan. He completed parenting classes and fairly consistently attended parenting time. Further, respondent-father regularly attended weekly counseling with his therapist. When the termination hearing began in February 2018, respondent-father had been consistently participating in therapy for nine months. Moreover, in December 2016, respondent-father voluntarily participated in a psychiatric assessment by Dr. Silverman. At that time, Dr. Silverman noted that respondent-father "did share details of his mental health history, medications, which does make him appear amenable to treatment." Then, in January 2018, respondent-father complied with the order that he undergo a *psychological* evaluation with the court's clinical psychologist, Sylvie Bourget. Respondent-father believed that he was attending an appointment for a psychiatric evaluation and medication assessment. Again, this would suggest that respondent-father was aggregable to treating his psychiatric conditions with medications.

It remains unclear whether respondent-father may be able to overcome the conditions that brought his children into care. Even with appropriate psychiatric care and medication, he may be unable to safely parent his children within a reasonable time. However, given DHHS's inadequate efforts, such a determination is premature. Based on the record presented, the L-GAL has failed to establish that the trial court clearly erred when it found that DHHS failed to make reasonable efforts toward reunifying respondent-father with his children.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Stephen L. Borrello
/s/ Jane M. Beckering